# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SAVANNAH BENTLEY,

     **Plaintiff,**

     v.                                      **Case No. 21-CV-1134-SCD**

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

     **Defendant.**

---

## DECISION AND ORDER

Savannah Bentley suffers from low back pain, painful skin lesions, obesity, depression, and anxiety. She applied for social security disability benefits claiming that her impairments made her unable to work. The Commissioner of the Social Security Administration denied Bentley's applications, and, after a hearing, an administrative law judge found Bentley not disabled under the Social Security Act. Bentley seeks judicial review of that decision, arguing that the ALJ erred in evaluating her skin condition, assessing the limitations stemming from all her impairments, and evaluating mental impairments. Because the ALJ did not reversibly err, and because substantial evidence otherwise supports the ALJ's decision, I will affirm the denial of disability benefits.

## BACKGROUND

Bentley was born in 1985. R. 38.[1] She received disability benefits as a young child—apparently due to a learning disability, though it's unclear from the record—but those benefits

---

[1] The transcript is filed on the docket at ECF No. 14-1 to ECF No. 14-7.

medically ceased when she was about twelve years old. *See* R. 228–29. Around that same time, Bentley began experiencing sores all over her body. R. 43–44. A few years later, she was diagnosed with hidradenitis suppurativa, a chronic skin condition that causes painful bumps on the skin. R. 44, 242.[2] Bentley never obtained her driver's license and stopped attending school after eleventh grade. R. 40, 233. After dropping out of high school, she worked as a resident assistant in a nursing home for nearly two years. R. 234. She later worked briefly as a deli worker and part time as a cleaner, but she stopped working in 2009 due to her hidradenitis suppurativa symptoms. R. 232–34, 265–69.

In addition to the skin condition, Bentley suffers from chronic low back pain that radiates into her hips and legs, depression, and anxiety. *See* R. 36–37, 41. She developed back pain following the birth of her daughter in 2004. She tried physical therapy, in-home therapy, pain medication, anti-inflammatory medication, muscle relaxers, and steroid injections, but nothing seemed to relieve her pain. R. 41. Bentley was diagnosed with depression and anxiety as a young adult. *See* R. 369. Over the years, she has been prescribed several anti-depressant medications and has attended individual therapy sessions with a psychologist. *See* R. 235, 363, 1793–1838.

In 2019, Bentley applied for re-entitlement of her childhood disability benefits and supplemental security income from the Social Security Administration. *See* R. 13, 208–14. She alleged disability beginning on December 31, 2006, due to hidradenitis suppurativa, chronic lumbar pain, depression, anxiety, and asthma. R. 13, 232. Bentley asserted that her

---

[2] "Hidradenitis suppurativa is 'a chronic skin disease which causes painful, boil-like lumps that form under the skin and often secrete pus and blood. HS occurs most often in areas where skin rubs together, such as the armpits, groin, and under the breasts.'" *Youmans v. Berryhill*, No. 2:18-CV-18-RJ, 2019 WL 1483452, 2019 U.S. Dist. LEXIS 57225, at *8 (E.D.N.C. Apr. 3, 2019) (quoting U.S. Dep't of Health & Human Servs., Nat'l Insts. of Health, Genetic & Rare Diseases Info. Ctr., https://rarediseases.info.nih.gov/diseases/6658/hidradenitis-suppurativa (last updated Nov. 8, 2021)).

2

impairments significantly affected her daily activities, though she could still cook simple meals, perform some household chores (with multiple breaks), and shop in stores a few times a month. *See* R. 242–51. She reported difficulties lifting, squatting, bending, standing, walking, sitting, kneeling, and climbing stairs, R. 248, and estimated that, without a break, she could sit for sixty to ninety minutes, stand for ten minutes, and walk for five to ten minutes, R. 251.

The state agency charged with reviewing the applications on behalf of the Social Security Administration denied the claim initially and upon Bentley's request for reconsideration. *See* R. 62–121. The physicians who reviewed the medical records found that, for purposes of the re-entitlement claim, Bentley retained the ability to perform medium exertional work. *See* R. 72–75, 100–102. As for the adult disability claim, the reviewing physicians found that Bentley retained the ability to perform light exertional work. *See* R. 86–89, 114–16, 118.

The state agency also evaluated Bentley's mental impairments. The reviewing psychologist at the initial level of review found that Bentley did not suffer from a severe mental impairment. *See* R. 71, 84. The reviewing psychologist at the reconsideration level, JoAnne Coyle, PhD, disagreed, finding that Bentley had severe depression. *See* R. 98–99, 111–12. Specifically, Dr. Coyle found that Bentley had a mild limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing herself.[3] R. 111–13. With respect to concentration, persistence, and pace—CPP in social security lexicon—Dr. Coyle found that Bentley was

---

[3] These four areas of mental functioning are known as the "paragraph B" criteria. The paragraph B criteria are measured on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2).

moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods R. 117. Given those CPP limitations, Dr. Coyle believed that Bentley could sustain attention or concentration for simple and multi-step tasks and could maintain effort for two-hour periods over the course of an eight-hour workday and standard workweek in a setting permissive of some degree of self pacing.

After the state-agency denial, an ALJ employed by the Social Security Administration held an evidentiary hearing on Bentley's applications. *See* R. 31–61. Bentley testified at the hearing. *See* R. 38–56. At the time, she was living with her sixteen-year-old daughter and using her daughter's disability benefits to pay bills and other expenses. R. 39–40. Bentley told the ALJ that she was unable to work due to back pain, painful hidradenitis suppurativa sores, obesity, and mental health issues. *See* R. 41–51. She stated that she experienced daily pain in her low back that was worse with prolonged lifting, standing, and sitting. R. 41. She explained that she had tried many forms of treatment for her back, but "nothing seem[ed] to really do anything." *Id.*

Bentley's testimony focused primarily on her skin condition. She indicated that she got sores all over her body, including her butt, butt crack, inner thighs, back of thighs, vagina, vaginal lips, armpits, face, ears, waistline, and breasts. R. 43, 53. Bentley stated that she got new sores about twice a week—more during the warmer months—and that each sore ranged in size from a pencil eraser to a quarter. R. 44–45. According to Bentley, the sores caused

4

sharp pain and, when located on her bottom, difficulty sitting. R. 46. She indicated that the minor sores healed on their own; others, however, had to be surgically removed. Bentley estimated that, over the last three years, she had lesions surgically removed just about every month and sometimes twice a month. She stated that her recovery following surgery depended on the size and the location of the lesion. R. 47. Sometimes she felt fine "within a couple of days, maybe like a week"; "other times . . . it takes a good three weeks for [her] to be able to walk on line[] or be able to sit for a little longer period of time." *Id.* Bentley indicated that certain clothing and shoes irritated her skin, so she wore baggy clothes and open-toed shoes. R. 54–55.

Bentley testified briefly about her obesity and mental impairments. She told the ALJ that she was skinny at one point, but her skin condition made it difficult to exercise, and she gained a lot of weight. R. 47–48. At the time of the hearing, Bentley weighed between 315 and 320 pounds (at 5'4"). R. 39. Bentley also indicated that she was stressed out daily by her own condition and her daughter's mental health issues. R. 48–49. She reported seeing a therapist twice a month for the last year or so and taking medication for anxiety and depression, but she denied any inpatient treatment, hospitalization, intensive outpatient treatment, or day programs over the last two years. R. 49. Bentley indicated that she didn't know how to be happy, and she didn't want to leave the house. R. 50. When asked about difficulties concentrating or focusing, Bentley responded, "Concentration, it's kind of a pain, because I have thousands of things that run through my mind of what do I need to do, what's coming up next. So sometimes it takes me a little longer to do what I was doing." *Id.*

Bentley also testified about her daily activities. She told the ALJ that the sores sometimes caused difficulty with personal care like showering and shaving. R. 51–52. Bentley

5

indicated that usually she could cook meals for herself, perform household chores (with constant breaks), and shop in stores (again, with breaks); other times she needed help from her mother or daughter. R. 52. Bentley stated that she did not have any hobbies. R. 52–53.

A vocational expert also testified at the hearing. *See* R. 56–60. The vocational expert testified that a hypothetical person with Bentley's vocational profile (i.e., twenty-one years old on the alleged disability onset date, a limited education, and minimal work history) could work as a compact assembly, a document preparer, or a table worker if she were limited to a restricted range of sedentary work. R. 57. According to the vocational expert, those jobs could still be performed if the individual needed to wear sandals and could not wear socks or closed-toed shoes while on the job. R. 59. When asked about employers' tolerance for missing work, the vocational expert said, "A person could be absent one, two, maybe even three times in a month. But if someone is absent every single month, and they never give back any days, when they run out, they would lose employment." R. 58.

In March 2021, the ALJ issued a written decision finding that Bentley was not disabled. *See* R. 10–30. The ALJ considered the disability applications under 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), which set forth a five-step process for evaluating disability benefits claims. At step one, the ALJ determined that Bentley had not engaged in substantial gainful activity since her alleged onset date (December 31, 2006). R. 16. The ALJ determined at step two that Bentley had five severe impairments: hidradenitis suppurativa, degenerative disc disease of the lumbar spine, obesity, depression, and anxiety. R. 16. At step three, the ALJ determined that Bentley did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 17–

6

18. The ALJ explicitly considered Listings 1.04 (degenerative disc disease of the lumbar spine—now Listing 1.15), 8.06 (hidradenitis suppurativa), 12.04 (depression), and 12.06 (anxiety) and Social Security Ruling 19-2p (obesity).

The ALJ next assessed Bentley's residual functional capacity—that is, her maximum capabilities despite her limitations, *see* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ determined that Bentley could perform less than the full range of sedentary work. R. 18–19. Specifically, she could not have any exposure to extreme heat, and she was able to perform simple, routine tasks and simple work-related decisions. In assessing that RFC, the ALJ considered Bentley's subjective allegations about her impairments, the medical evidence, and the prior administrative findings. *See* R. 19–25.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Bentley did not have any past relevant work R. 25. The ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Bentley could perform. R. 25–26. Relying on the vocational expert's testimony, the ALJ mentioned three examples: compact assembly, document preparer, and table worker.

Based on those findings, the ALJ determined that Bentley was not disabled from her alleged onset date through the date of the decision. R. 26.

The Appeals Council denied Bentley's request for review, *see* R. 1–6, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

In October 2021, Bentley filed this action seeking judicial review of the Commissioner's decision denying her claims for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. United States District Judge William C. Griesbach

7

reassigned the matter to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6, 8. Bentley filed a brief in support of her disability claims, ECF No. 15; Kilolo Kijakazi, Acting Commissioner of the Social Security Administration, filed a brief in support of the ALJ's decision, ECF No. 19; and Bentley filed a reply brief, ECF No. 20.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). In reviewing the record, I "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir.

8

2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Bentley contends the ALJ erred in evaluating the severity of her hidradenitis suppurativa, not accounting for her frequent medical treatment, assessing the limitations stemming from all her physical impairments, and evaluating her mental impairments.

**I.  The ALJ Did Not Reversibly Err in Evaluating Bentley's Hidradenitis Suppurativa**

Bentley first argues that the ALJ erred in evaluating the severity of her hidradenitis suppurativa at step three of the sequential evaluation process. "At step three, the ALJ must determine whether the claimant's impairments are 'severe enough' to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary." *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020) (citing 20 C.F.R. § 404.1525(a)). "An impairment is presumptively disabling if it is listed in the relevant regulations' appendix, *see* 20 C.F.R. § 404.1525(a), or if it is 'medically equivalent' to a listing, *id.* § 404.1526(a)." *Jeske*, 955 F.3d at 588. "When evaluating whether an impairment is presumptively disabling under a listing, the ALJ 'must discuss the listing by name and offer more than a perfunctory analysis of the listing.'" *Id.* (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

Bentley maintains that the ALJ did not sufficiently articulate why her hidradenitis suppurativa failed to meet the criteria of Listing 8.06. To meet Listing 8.06, the claimant must demonstrate "extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least 3 months despite continuing treatment as prescribed." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 8.06. "Extensive skin lesions are those that involve multiple

9

body sites or critical body areas, and result in a very serious limitation." 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 8.00(C)(1). The listings provide three non-exhaustive examples of extension skin lesions that result in a very serious limitation: (a) "lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity"; (b) "lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements"; and (c) "lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate." *Id.*

The ALJ's finding that Bentley did not qualify as disabled because she did not meet the requirements of Listing 8.06 is extremely brief: "The undersigned evaluated the claimant's hidradenitis suppurativa under listing 8.06, but the record does not document extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least three months despite continuing treatment as prescribed." R. 17. In other words, the ALJ merely repeated the language of the listing and indicated his view that the plaintiff did not meet it. "This is the very type of perfunctory analysis [the Seventh Circuit has] repeatedly found inadequate to dismiss an impairment as not meeting . . . a Listing." *Minnick v. Colvin*, 775 F.3d 929, 935–36 (7th Cir. 2015) (citing *Kastner v. Astrue*, 697 F.3d 642, 647–48 (7th Cir. 2012); *Barnett*, 381 F.3d at 670; *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)).

The Commissioner argues that, considering the decision as a whole, the ALJ's listings analysis satisfied the low articulation bar set by the Seventh Circuit. In *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015), the Seventh Circuit held that an ALJ's discussion of the evidence when evaluating a claimant's RFC can "provide[] the necessary detail to review the ALJ's step 3 determination in a meaningful way." The Seventh Circuit recently reaffirmed this principle in *Jeske*: "[W]hen an ALJ explains how the evidence reveals a claimant's functional

10

capacity, that discussion may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing." *Jeske*, 955 F.3d at 588–90. The Seventh Circuit also rejected the argument that this practice violates the command of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), explaining that reviewing courts do not violate *Chenery* when they consider "the ALJ's more thorough discussion of the evidence." *Jeske*, 955 F.3d at 589–90. In other words, the ALJ does not need to repeat a discussion of the evidence throughout his decision. *Id.* at 590 (citing *Curvin*, 778 F.3d at 650).

In this case, however, the ALJ's later discussion of Bentley's hidradenitis suppurativa does not constitute substantial evidence in support of his listing finding. When evaluating Bentley's RFC, the ALJ noted that Bentley had a long history of lesions that she treated with medications and sometimes surgery, including excision, irrigation, and drainage of the lesions. R. 20 (citing Exhibits 7F; 12F; 13F; Hearing Testimony). The ALJ also noted that Bentley testified that heat triggered her lesions, that some lesions were small and did not require surgical intervention, and that recent notes suggested improvement with medication. *Id.*; *see also* R. 23 (citing Exhibit 12F). Those brief remarks do not make up for the lack of analysis at step three, as the ALJ failed to meaningfully engage with the specific requirements of Listing 8.06. The ALJ also did not cite or discuss significant medical records relating to Bentley's hidradenitis suppurativa, including Exhibits 1F (R. 298–611), 5F (R. 818–74), 14F (R. 1840–43), 17F (R. 1847–1914), and 18F (R. 1915–18). Thus, it's unclear from the decision whether the ALJ considered and dismissed that evidence or missed it completely. The ALJ therefore erred by failing to build a logical bridge from the evidence to his conclusion that

Case 2:21-cv-01134-SCD   Filed 12/16/22   Page 11 of 25   Document 21

Bentley's hidradenitis suppurativa did not satisfy the requirements of Listing 8.06. *See Minnick*, 775 F.3d at 935–36.

The Commissioner argues that any error at step three is harmless because Bentley has failed to demonstrate that she met all the requirements of Listing 8.06. For support, the Commissioner relies on three unpublished Seventh Circuit cases: *Knox v. Astrue*, 327 F. App'x 652 (7th Cir. 2009); *Zatz v. Astrue*, 346 F. App'x 107 (7th Cir. 2009); and *Lloyd v. Berryhill*, 682 F. App'x 491 (7th Cir. 2017). In *Knox*, the court affirmed the denial of disability benefits despite the ALJ's failure to reference any specific listing or provide any explanation for why the claimant's symptoms did not equal a listing. *Knox*, 327 F. App'x at 655. The court noted that, "[a]lthough an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)). The court excused the ALJ's deficient analysis in that case because the claimant "did not present any medical evidence supporting the position that his impairments me[t] or equaled a particular listing," "[t]wo state-agency physicians concluded that [the claimant's] impairments did not meet or medically equal a listing, and there was no medical opinion to the contrary." *Knox*, 327 F. App'x at 655. Similarly, the court affirmed the denial of benefits in *Zatz*—even though the ALJ did not cite arguably the most relevant listing— because "the ALJ's consideration of the listing [was] apparent from the record." *Zatz*, 346 F. App'x at 110–11 (citing *Rice v. Barnhart*, 384 F.3d 363, 369–70 (7th Cir. 2004)). The court further noted that the claimant failed to satisfy his burden of proving that his condition met all the criteria of that listing. *Zatz*, 346 F. App'x at 111. Finally, in *Lloyd*, the court held that any error in the ALJ's listings analysis was harmless in part because the claimant failed to

show that he met all the specified criteria. *Lloyd*, 682 F. App'x at 496; *see also Sosinski v. Saul*, 811 F. App'x 380, 381 (7th Cir. 2020) ("But even if the ALJ does not offer [more than a perfunctory] analysis, we do not reverse if the claimant fails to show that he meets the criteria for that listing.").

The Commissioner does not reconcile the unpublished cases she relies upon with the published line of cases in which the Seventh Circuit has remanded based on a perfunctory listings analysis. *See, e.g.*, *Minnick*, 775 F.3d at 935–36; *Kastner*, 697 F.3d at 646–49; *Ribaudo*, 458 F.3d at 583–84; *Barnett*, 381 F.3d at 668–71; *Blakes*, 331 F.3d at 568–70; *Steele v. Barnhart*, 290 F.3d 936, 940–42 (7th Cir. 2002). For example, in *Minnick*, the court reversed and remanded a decision where the ALJ provided only two sentences in support of her step-three finding. *Minnick*, 775 F.3d at 935–36. The court also provided an example of the listing analysis' inadequacy, noting that "the ALJ failed to acknowledge several aspects of the record that could in fact meet or equal Listing 1.04." *Id.* at 936. Likewise, in *Ribaudo*, the court reversed and remanded due to a deficient step-three analysis, notwithstanding the claimant's burden to "show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo*, 458 F.3d at 583 (citing *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)). These cases suggest that the ALJ's duty to provide a non-perfunctory analysis is not dependent on the claimant first demonstrating that she satisfied all the criteria of a particular listing. *See Nicole W. v. Saul*, No. 18 CV 50292, 2020 WL 3799158, 2020 U.S. Dist. LEXIS 118705, at *17 (N.D. Ill. July 7, 2020) (denying the Commissioner's motion to reconsider a decision remanding a case for the ALJ to provide a more thorough step-three analysis). Thus, in contrast to the Commissioner's argument, Bentley does not need to conclusively prove she met Listing 8.06 to obtain a remand for the ALJ's step-three error. *See Harris v. Kijakazi*, No.

13

20-C-1021, 2021 WL 3769911, 2021 U.S. Dist. LEXIS 160373, at *66–67 (E.D. Wis. Aug. 25, 2021) ("While the court need not remand on a Listing claim unless the claimant has presented substantial evidence touching on each of the criteria, there is no requirement that he conclusively establish disability.").

Nevertheless, Bentley has not cited any authority to suggest that traditional harmless-error analysis does not apply to an ALJ's perfunctory listings analysis. The cases she relies upon (and others like them) do not mandate reversal and remand whenever an ALJ provides only a superficial analysis a step three. Indeed, the Seventh Circuit's statement in *Ribaudo* that a deficient listings analysis *may* require remand suggests that remand is not *required*. *Ribaudo*, 458 F.3d at 583 ("But this court has also held that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand.") (citations omitted); *but see Rice*, 384 F.3d at 370 ("We have recently held that where an ALJ omits reference to the applicable listing and provides nothing more than a superficial analysis, reversal and remand is required."). Many district courts in this circuit have applied the harmless-error doctrine to inadequate step-three findings. *See, e.g.*, *Stork v. Commissioner*, No. 3:20-CV-725 JD, 2022 WL 1013928, 2022 U.S. Dist. LEXIS 63074, at *14–15 (N.D. Ind. Apr. 5, 2022) ("Even if Listing 1.04(B) had been identified at the hearing, failure to consider it constituted harmless error.").

Under the harmless-error doctrine, remand is not required if the reviewing court "can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707–08 (7th Cir. 2013) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003)). "[T]he harmless error

14

standard is not . . . an exercise in rationalizing the ALJ's decision and substituting [the reviewing court's] own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892. Rather, the question for a reviewing court "is now prospective— can [I] say with great confidence what the ALJ would do on remand—rather than retrospective." *Id.*

Based on my review of the entire record, I can say with great confidence that on remand the ALJ would find that Bentley's hidradenitis suppurativa does not meet the requirements of Listing 8.06. The record clearly shows that Bentley had a long history of hidradenitis suppurativa that caused painful skin lesions on her body, most frequently her armpits, lower abdomen, breasts, upper thighs, and buttocks. From 2016 to 2020, in particular, she had frequent outbreaks and lesions surgically removed nearly every month. *See, e.g.*, R. 425–28, 434–42, 529–34, 820–47, 855–73, 1049, 1244–47, 1842, 1844, 1915.

The record, however, does not show that Bentley's skin lesions were "extensive," as required by Listing 8.06 and defined in the listings. A skin lesion is extensive only if it results in "a very serious limitation." *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 8.00(C)(1). Bentley argues that her skin lesions "affected" her ability to stand and walk, but the records she cites do not reveal a very serious limitation in her ability to ambulate. *See* ECF No. 15 at 7 (citing R. 36–37, 47, 55, 242, 248, 387–88, 434–36, 612, 1039–41, 1086, 1088, 1199, 1201). Indeed, as the ALJ acknowledged in his decision, Bentley demonstrated a normal gait and station during nearly every physical examination, *see* R. 21 (citing Exhibit 7F/257), R. 22 (citing Exhibits 7F/17, 38, 40, 48, 52, 57, 134, 142, 147, 157, 184, 213, 223, 230, 232; 8F/6; 12F/188; 13F/5), R. 23 (citing Exhibit 12F/81), including during appointments where she complained of painful skin lesions, *see, e.g.*, R. 441, 533, 846, 868, 1246. Bentley does not cite—and I

15

cannot find—any records showing that her lesions resulted in any other functional limitation, let alone a very serious one. Moreover, no medical expert opined that Bentley's hidradenitis suppurativa met the requirements of Listing 8.06.

Because the record clearly shows that Bentley's skin lesions did not result in any very serious functional limitations, the ALJ's deficient listing analysis does not require remand.

## II. The ALJ Did Not Reversibly Err in Failing to Incorporate Bentley's Claimed Absenteeism into the RFC Assessment

Bentley argues that the ALJ also committed reversible error when he failed to consider the effect her significant medical treatment had on her ability to sustain regular and continuing employment. As support, Bentley lists the number of doctor visits she attended each year from 2012 to 2020—an average of more than twenty each year—and the reasons for those appointments. Bentley says those records prove that she would have missed too much work during that time period to maintain regular employment, as the vocational expert testified at the hearing that a worker would be fired if she consistently missed work two days each month.

Bentley has not demonstrated that the ALJ reversibly erred in not considering how her medical treatment impacted her RFC. She attributes her absenteeism to two causes—the twenty-plus doctor appointments she attended each month and the recovery period each time she had a lesion surgically removed—but neither cause demonstrates she would have been unable to sustain work on a regular, continuing basis. First, Bentley "cannot point to anything in the record to suggest that [her] appointments would require [her] to miss a full day of work or that [she] could not schedule [her] appointments outside of working hours." *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018). Second, Bentley has not shown that she would have missed on average two or more days of work each month recovering from lesion-removal surgery. Bentley testified at the hearing that, depending on the size and the location of the

16

lesion, it took her up to a few weeks following an excision before she felt good enough to engage in daily functioning. R. 47. The record, however, does not support that claim, as the excisions were performed primarily at regular follow-up visits for hidradenitis suppurativa, and no doctor advised that she needed significant recovery time. *See, e.g.*, R. 832–41, 847, 855–60, 863, 869, 871–73, 1001, 1015, 1244–46. Indeed, the post-excision instructions typically focused on wound care, *see, e.g.*, R. 837, 869, 872, 1687, 1750, including one indicating "she will be able to go home afterwards without any issue," R. 863. The ALJ therefore did not need to account for the time Bentley spent receiving medical treatment and recovering from treatment in fashioning her RFC.

### III.    The ALJ Did Not Reversibly Err in Evaluating Bentley's Physical Impairments

Bentley argues that substantial evidence does not support the ALJ's finding that she could perform the sitting requirements of sedentary work and that she didn't have any additional postural limitations.[4] She first maintains that the ALJ failed to consider the combined effects of her impairments. According to Bentley, the ALJ didn't address how her obesity impacted her ability to sit and stand and ignored evidence that prolonged sitting was not possible given her back impairment and hidradenitis suppurativa.

Bentley has not demonstrated that the ALJ failed consider her impairments in the aggregate. She accuses the ALJ of ignoring case law concerning the role obesity should play in the RFC analysis, but the quote included in her brief does not appear in the case she cites. *See* ECF No. 15 at 14–15 (quoting *Martinez v. Astrue*, 630 F.3d 693, 688–89 (7th Cir. 2011)).

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

All the Seventh Circuit said about obesity in *Martinez* and the case Bentley meant to cite—*Browning v. Colvin*, 766 F.3d 702, 707 (7th Cir. 2014)—is that the ALJ must consider the bearing of obesity on the claimant's ability to work. The ALJ explicitly acknowledged this requirement, found obesity to be a severe impairment, noted Bentley's allegations about how her impairments affected her, discussed Bentley's extremely high BMI (sometimes over 54), and explained why Bentley remained capable of sedentary work. *See* R. 17, 19–20, 24. Bentley does not cite any objective medical evidence showing that her obesity, when combined with her other impairments, caused greater functional limitations than the ALJ assessed.

Bentley points to her subjective statements that she was unable to engage in prolonged sitting or standing, but the ALJ considered those allegations and explained why he didn't fully believe them. The ALJ noted that Bentley claimed in her function reports that her impairments affected her ability to lift, walk, sit, stand, bend, squat, kneel, climb, reach, use her hands, remember, complete tasks, concentrate, understand, follow instructions, handle stress and change, and get along with others. R. 19 (citing Exhibits 3E; 8E). The ALJ also noted that Bentley claimed she could sit for sixty to ninety minutes, stand for ten minutes, and walk for five to ten minutes, respectively, without a break. R. 19 (citing Exhibit 3E/10). Finally, the ALJ noted that Bentley claimed her impairments limited her ability to tend to her daily activities, including issues bending over to perform personal care, taking longer and receiving help from others performing household chores, making simple meals due to difficulties standing for a prolonged period of time, taking frequent breaks when shopping, and not engaging in hobbies because of pain and difficulty sitting and standing. R. 19 (citing Exhibits 3E; 8E).

According to the ALJ, Bentley's allegations of disabling symptoms and limitations were not consistent with or supported by the overall record. *See* R. 19–24. The ALJ first considered the objective medical evidence. The ALJ noted that Bentley was very obese and that she had degenerative disc disease of the lumbar spine with low back pain that radiated into her legs. R. 20 (citing Exhibits 12F; 13F/5). The ALJ also discussed imaging showing mild degenerative changes, mild to moderate facet arthropathy, no significant spinal canal or neural foraminal stenosis, and no nerve root impingement. R. 20 (citing Exhibits 7F/280–81; 12F/190). And the ALJ acknowledged that at times Bentley demonstrated tenderness and reduced range of motion on examination. R. 20 (citing Exhibits Ex. 7F/119, 142, 213, 223, 230, 232, 237; 8F/6; 12F/188, 337). The ALJ determined, notwithstanding those findings, that Bentley regularly displayed good musculoskeletal and neurological function, including no acute distress; limited or no tenderness; normal coordination, sensation, motor function, strength, and gait; full range of motion; and negative straight leg raise testing. R. 21 (citing Exhibits 7F/257; 12F/212, 218, 220), R. 21–22 (citing Exhibits 7F/237, 250, 253), R. 22 (citing Exhibits 7F/17, 38, 40, 48, 52, 57, 134, 142, 147, 157, 184, 213, 223, 230, 232, 237, 250, 253; 8F/6; 10F/2; 12F/16, 20, 91, 123, 139, 188, 233; 13F/5).

Next, the ALJ considered Bentley's treatment measures. The ALJ noted that, although at times Bentley experienced exacerbations of her back pain, she reported benefit from conservative treatment. R. 22 (citing Exhibits 12F/182–83). For example, upon being discharged from physical therapy in April 2015, Bentley demonstrated normal range of motion, full strength, and normal palpation and reported pain of only one out of ten with housework. The ALJ noted that Bentley also received several epidural steroid injections, which provided good—albeit temporary—relief. R. 22 (citing Exhibits 12F/81, 130, 137, 141,

145, 187), R. 23 (citing Exhibits 12F/44, 49, 55, 77). The ALJ observed that Bentley's treatment remained conservative despite occasional exacerbations of pain.

The ALJ also considered Bentley's hidradenitis suppurativa, noting that she had a long history of lesions that required intervention. R. 23. However, according to the ALJ, the record did not show lesions of such intensity or requiring surgical treatment of such frequency that they would preclude sedentary work. As support, the ALJ noted that Bentley had normal physical exams, Bentley testified that some lesions were small and did not require surgical intervention, and recent notes suggested improvement with medication. *Id.* (citing Exhibit 15F).

Finally, the ALJ considered the opinion evidence in the record. The ALJ found somewhat persuasive the reviewing physicians' findings that Bentley was capable of light or medium exertional work. *See* R. 23–24 (citing Exhibits 3A; 4A; 5A; 6A). Again, the ALJ noted the mild to moderate imaging findings, the relatively normal clinical exams, and the benefit from non-operative treatment. R. 23–24 (citing Exhibits 7F/17, 48, 57, 134, 142, 147, 157, 184, 213, 223, 230, 232, 257, 280; 8F/6; 10F/12; 12F/16, 91, 123, 139, 188, 190, 212, 218, 220, 233; 13F/5). The ALJ explicitly found, however, that the reviewing physicians didn't give enough weight to Bentley's obesity and subjective allegations of pain. *See* R. 24. Considering that additional evidence, the ALJ found that Bentley was capable of only sedentary work.

Bentley has not demonstrated that the ALJ patently erred when evaluating her impairment-related symptoms. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) ("We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support.") (quoting *Murphy v. Colvin*, 759

F.3d 811, 816 (7th Cir. 2014)). The ALJ sufficiently explained why he did not fully believe Bentley's allegations and supported that finding with substantial evidence. Bentley points out evidence the ALJ allegedly ignored concerning her limitations with prolonged sitting. Although the ALJ didn't consider each of those records, he didn't have to. The ALJ considered similar evidence, and Bentley has not shown that the ALJ ignored an entire line of evidence contrary to his adverse symptom finding. *See Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) ("[A]n ALJ doesn't need to address every piece of evidence, but he or she can't ignore a line of evidence supporting a finding of disability.") (citation omitted).

Bentley also seems to suggest that the ALJ impermissibly "played doctor" when assessing her RFC. As support, she points out that "the ALJ's sedentary restriction is not found anywhere else in the decision, with the only medical opinions provided by non-examining State Agency doctors." ECF No. 15 at 14. This argument misunderstands the role of the ALJ. "The determination of a claimant's RFC is a matter for the ALJ alone . . . to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)); *see also Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (explaining that the ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians"). Thus, the RFC did not have to mirror the findings of any medical expert. When assessing Bentley's RFC, the ALJ appropriately considered Bentley's subjective allegations, the objective medical evidence, and the opinion evidence. Bentley points to some evidence the ALJ may have missed, but that evidence does not compel a more restrictive RFC.

Accordingly, Bentley has not demonstrated that the ALJ reversibly erred in assessing her physical limitations.

**IV.    The ALJ Did Not Reversibly Err in Evaluating Bentley's Mental Impairments**

Finally, Bentley argues that the ALJ erred in evaluating her depression and anxiety. She first maintains that the ALJ committed plain legal error when discussing the paragraph B criteria. The ALJ determined that Bentley had a mild limitation in understanding, remembering, or applying information; a mild limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a moderate limitation adapting or managing herself. *See* R. 17–18. As support, the ALJ contrasted Bentley's claimed difficulties in those functional areas with the daily activities she reported in her function reports, including preparing simple meals, shopping in stores, performing household chores. *Id.* (citing Exhibits 3E; 8E). The ALJ also discussed Bentley's good functioning during her mental status exams: treating providers consistently described her as pleasant and cooperative, and she consistently exhibited normal memory, concentration, attention, thought processes, judgment, insight, fund of knowledge, and language. R. 17–18 (citing Exhibits 7F/17, 27, 48, 52, 57, 71, 86, 134, 147, 157, 165, 176, 181, 184, 193, 213, 234; 8F/6, 19; 9F/14; 10F; 12F; 13F/7, 17, 32, 34, 37, 46, 49, 51). Finally, the ALJ noted that Bentley had not "required escalation of her care to highly structured or intensive mental health care." R. 18.

Bentley accuses the ALJ of not addressing her work-related functioning. She criticizes the ALJ for relying on her reported activities and mental exams, but both are appropriate considerations. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(F)(3)(b) ("You use the same four areas of mental functioning in daily activities at home and in the community that you would use to function at work."); 20 C.F.R., Pt. 404, Subpt. P, App. 1 § 12.00(C)(2)(c) (explicitly listing physical and mental status examinations as evidence the ALJ will consider). Bentley has not demonstrated that the ALJ erred in extrapolating from those settings her

mental abilities in the workplace. (Indeed, Bentley has a very limited work history, so it's unclear what other evidence the ALJ should have relied upon for his paragraph B findings.) Bentley also criticizes the ALJ for mentioning her level of mental health care. But unlike in the cases she cites, *see* ECF No. 15 at 18, the ALJ here did not suggest that Bentley would have been hospitalized if she were as mentally limited as she claimed. Rather, the ALJ simply remarked that Bentley's mental health treatment was limited to therapy and medication. Bentley has not demonstrated why the ALJ's decision should be reversed based on one sentence that played a limited role in the ultimate finding.

Bentley also maintains that the ALJ's RFC assessment does not sufficiently accommodate her moderate limitations in concentrating, persisting, or maintaining pace. As for mental functioning, the ALJ found that Bentley was able to perform simple, routine tasks and simple work-related decisions. R. 19. Bentley lists several cases in which the Seventh Circuit has found similar limitations to not sufficiently accommodate moderate CPP limitations. *See* ECF No. 15 at 19–21. However, she makes little effort to demonstrate why the ALJ's mental RFC assessment *in this case* does not sufficiently account for *her* limitations with concentration, persistence, or maintaining pace. She seems to suggest that the only evidence the ALJ cited in support of the mental RFC assessment was the administrative findings of Dr. Coyle, the reviewing state-agency psychologist at the reconsideration level. Not true. The ALJ discussed Bentley's mental health treatment at length, noting that she exhibited good cognitive and social function during her mental status exams and benefitted from conservative mental health treatment. *See* R. 17–18, 20–21, 23. Bentley does not point to *any* evidence the ALJ failed to discuss that reflects greater restrictions in her mental RFC.

Bentley also criticizes the ALJ for not adopting all of Dr. Coyle's findings. Dr. Coyle found that Bentley was moderately limited in her ability to out carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods R. 117. She then translated those findings to narrative form, explaining that Bentley could sustain attention or concentration for simple and multi-step tasks and could maintain effort for two-hour periods over the course of an eight-hour workday and standard workweek in a setting permissive of some degree of self pacing. The ALJ determined that Dr. Coyle's finding that Bentley could perform simple instructions with sufficient attention and concentration was supported by and consistent with Bentley's mental status exams, reported activities, and conservative treatment. R. 24 (citing Exhibits 3E; 8E: 7F/17, 27, 48, 52, 57, 71, 86, 134, 147, 157, 165, 176, 181, 184, 193, 213; 8F/6, 19; 9F/14; 13F/17). However, the ALJ determined that the record did not support Dr. Coyle's self-pacing finding, and he declined to include such a limitation in the RFC. *See* R. 19, 24. Bentley does not take issue with *any* of the evidence the ALJ cited or *any* of the reasons the ALJ offered for evaluating the persuasiveness of Dr. Coyle's findings.

Similarly, Bentley does not explain what restrictions would have adequately accommodated her limitations with concentration, persistence, and maintaining pace. She says "[t]he evidence demanded additional RFC restrictions of the inability to maintain CPP for a 2-hour segment, due to the combination of her mental impairments and her significant physical pain, even in an unskilled full-time employment environment." ECF No. 15 at 22.

24

What evidence? She doesn't cite any, and my review of the record hasn't uncovered any evidence compelling such a restriction. Bentley barely mentioned her mental health at the administrative hearing, claiming merely that her concentration was "kind of a pain" and that sometimes her racing thoughts interfered with her ability to complete tasks on time. R. 50. That testimony does not suggest that the ALJ should have included further restrictions in the RFC to account for Bentley's concentration issues, especially given that Bentley exhibited normal concentration and attention during her mental status exams. Thus, any error with respect to the ALJ's CPP limitations is harmless. *See, e.g.*, *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (finding alleged CPP error harmless because the plaintiff didn't hypothesize any work restrictions that might address his CPP limitations).

**CONCLUSION**

For all the foregoing reasons, I find that Bentley has not demonstrated that the ALJ committed reversible error in evaluating the severity of her hidradenitis suppurativa, not accounting for her frequent medical treatment, assessing the limitations stemming from all her physical impairments, and evaluating her mental impairments. I therefore **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 16th day of December, 2022.

STEPHEN C. DRIES
United States Magistrate Judge